UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

------------------------------------------------------------
                                )   CRIMINAL FILE
UNITED STATES of AMERICA         )   NO. 15-CR-11 (PJS/JSM)
                                )
        vs.                      )
                                )   Courtroom 9 East
MAXIM SENAKH                     )   Friday, February 19, 2016
                                )   Minneapolis, Minnesota
------------------------------------------------------------


**AUDIO DISC TRANSCRIPTION OF**:


**D E T E N T I O N   H E A R I N G**


BEFORE THE HONORABLE JANIE S. MAYERON
UNITED STATES MAGISTRATE JUDGE



**A P P E A R A N C E S:**


For the Government:     **OFFICE OF THE U.S. ATTORNEY**
                        By:  KEVIN S. UELAND
                             Assistant U.S. Attorney
                        600 United States Courthouse
                        300 South Fourth Street
                        Minneapolis, Minnesota  55415


For the Defendant:      **OFFICE OF THE FEDERAL PUBLIC DEFENDER**
                        By:  MANVIR K. ATWAL
                        107 United States Courthouse
                        300 South Fourth Street
                        Minneapolis, Minnesota  55415


Court Interpreter:      Gennady Bronshteyn (Russian)


**AUDIO DISC TRANSCRIBED BY:**


                        **TIMOTHY J. WILLETTE, RDR, CRR, CRC**
                        Official Court Reporter - U.S.D.C.
                        1005 United States Courthouse
                        300 South Fourth Street
                        Minneapolis, Minnesota  55415
                        612.664.5108

1          (11:08 a.m.)

2                              **P R O C E E D I N G S**

3                               **IN OPEN COURT**

4          (Defendant present)

5              THE COURT:  Good morning, everyone.  I am

6     Magistrate Judge Mayeron.  We're here this morning in the

7     matter of the United States of America versus Maxim Senakh

8     or Senakh.  I may -- I have a feeling I'm mispronouncing the

9     defendant's name, but hopefully Ms. Atwal will assist me on

10    this.

11             This is Court File Number 15-11.  At this time, I

12    would like to administer the oath to the interpreter, if you

13    could please rise.

14             Would you please state your full name and spell

15    your last name, please.

16             THE INTERPRETER:  Gennady Bronshteyn.

17    G-E-N-N-A-D-Y; Bronshteyn, B-R-O-N-S-H-T-E-Y-N, state

18    certified Russian interpreter.

19             THE COURT:  Thank you.

20            **GENNADY BRONSHTEYN, INTERPRETER, SWORN**

21             THE INTERPRETER:  I do.

22             THE COURT:  Thank you.

23             We're here today to address the issue of detention

24    or release of the defendant.  If counsel would identify

25    themselves, starting first with the United States.

1             MR. UELAND:  Good morning, Your Honor.  Kevin

2    Ueland on behalf of the United States.

3             THE COURT:  All right.  And on behalf of the

4    defendant.

5             MS. ATWAL:  Good morning, Your Honor.  Manny Atwal

6    on behalf of Maxim Senakh, who's sitting next to me.

7             THE COURT:  All right.  Thank you.

8             Is the Government continuing in its motion for

9    detention?

10            MR. UELAND:  We are, Your Honor.

11            THE COURT:  Thank you.  Is your client contesting

12   detention?

13            MS. ATWAL:  He is, Your Honor.

14            THE COURT:  All right.  Is the Government prepared

15   to proceed?

16            MR. UELAND:  We are, Your Honor.

17            THE COURT:  All right.  Do you intend to call

18   witnesses or submit evidence, or will you be arguing based

19   on the bond report and the indictment?

20            MR. UELAND:  Your Honor, the Government intends to

21   call one witness and submit three exhibits.

22            THE COURT:  All right.  Go ahead then.

23            MR. UELAND:  Your Honor, the United States

24   calls --

25            THE INTERPRETER:  Your Honor?

1        THE COURT:  Yes.

2        THE INTERPRETER:  I'm sorry, from the interpreter.

3   The interpreter would like to request people to pause

4   between the question and the answer to give the interpreter

5   the chance to complete the interpretation.

6        THE COURT:  Certainly.  All right.  We will have

7   to work hard and you may have to make noise and keep

8   reminding us.

9        THE INTERPRETER:  I will.  Thank you.

10        THE COURT:  Thank you.

11        All right.  Mr. Ueland?

12        MR. UELAND:  Your Honor, the United States calls

13   Special Agent Paul Couturier.

14        THE COURT:  If you would come over here, please.

15        If you would stand, please, and raise your right

16   hand.

17        **PAUL COUTURIER, GOVERNMENT'S WITNESS, SWORN**

18        THE WITNESS:  Yes, ma'am.

19        THE COURT:  Please be seated, state your full name

20   and spell your last name, please.

21        THE WITNESS:  My full name is Paul Couturier.

22   Last name is spelled C-O-U-T-U-R-I-E-R.

23        THE COURT:  All right.  And again, for the benefit

24   of the interpreter, Mr. Ueland will be asking questions.  If

25   you would pause, you will see that the interpreter will be

1    providing information to the defendant and then give your

2    answer.

3              THE WITNESS:  Yes, ma'am.

4              THE COURT:  So it's going to be a little slower

5    than usual, all right?

6              THE WITNESS:  Okay.

7              THE COURT:  Okay.  Mr. Ueland, go ahead.

8              MR. UELAND:  Thank you, Your Honor.

9                        **DIRECT EXAMINATION**

10   BY MR. UELAND:

11   Q.  Good morning.

12   A.  Good morning.

13   Q.  Who are you employed by?

14   A.  I'm employed by the Federal Bureau of Investigation.

15   Q.  What's your title?

16   A.  I'm a Special Agent.

17   Q.  How long have you been a Special Agent with the FBI?

18   A.  I've been a Special Agent with the FBI since 2008.

19   Q.  And what's your current assignment?

20   A.  My current assignment is the Cyber Squad, Minneapolis

21   Division.

22   Q.  And what are your duties and responsibilities as a

23   member of that squad?

24   A.  I investigate computer crimes, cyber crimes,

25   specifically national security and criminal intrusions.

1    Q.  Have you reviewed the indictment in this matter?

2    A.  I have.

3    Q.  And have you spoken with the primary case agent in this

4    case?

5    A.  Yes, I have.

6    Q.  Are you familiar with the facts and circumstances

7    surrounding the arrest of the defendant and his extradition

8    from Finland?

9    A.  Yes, I am.

10   Q.  You testified that your duties include the investigation

11   of cyber crime --

12   A.  Yes.

13   Q.  -- computer crime.

14   A.  Yes.

15   Q.  What are we talking about when we're talking about cyber

16   crime, Special Agent?

17   A.  We're talking about people who use computers and network

18   devices to commit crimes, specifically using computers or

19   other network devices, and typically the Internet.

20   Q.  Okay.  Now, prior to your time working with the Cyber

21   Squad, did you investigate investigate child pornography

22   cases as well?

23   A.  Yes, I did.

24   Q.  And like cyber crime, cases involving child pornography

25   often also involve the use of the Internet, is that right?

1     A.  Yes, they do.

2     Q.  And investigating those cases, one of the ways in which

3     law enforcement identifies the criminal actors is by trying

4     to determine who the individual is who's associated with a

5     particular IP address is being used to trade child

6     pornography online, is that right?

7     A.  Yes, that's correct.

8     Q.  Okay.  Now, when you're investigating cyber crime of the

9     type that's charged in the indictment, the investigation

10    isn't typically that straightforward, is it?

11    A.  Yes, that's correct.

12    Q.  Okay.  And why is that?

13    A.  Because a lot of cyber actors, from my experience, tend

14    to try to hide their origin, so they use certain things in

15    order to hide where they're actually coming from.

16    Q.  Okay.  So they're doing different things in order to

17    obfuscate their identity, is that right?

18    A.  Yes.

19    Q.  Okay.  So, for example, in contrast to someone who's in

20    your experience in a child pornography investigation logging

21    on to their home computer, a cyber actor, or a cyber

22    criminal, typically avoids logging on to the Internet using

23    their home computer.

24            MS. ATWAL:  Objection.  Leading.

25            THE COURT:  Overruled.  You may answer.

1   A.  Yes, typically they would.

2   Q.  Okay.  How do they log on to the Internet if they're not

3   using their own computer?

4              THE INTERPRETER:  Your Honor?

5              THE COURT:  Yes.

6              THE INTERPRETER:  I'm just giving a signal to

7   wait.

8              THE COURT:  Okay.

9              MR. UELAND:  Sorry.

10             THE COURT:  All right.  Ready to go?

11             MS. ATWAL:  Your Honor, may I have a moment?

12             THE COURT:  Yes.

13             (Discussion off the record between Ms. Atwal and

14  the interpreter)

15                       IN OPEN COURT

16             THE COURT:  All right.  I'm going to ask you --

17  you're going to have to wait, pause -- I know you're

18  listening to see where the interpreter is in his

19  interpretation.  You may have to wait a little bit longer.

20             THE WITNESS:  Okay.  Yes, ma'am.

21             THE COURT:  All right.  Thank you.

22             Mr. Ueland, do you want to repeat your question?

23             MR. UELAND:  I will, Your Honor.

24             THE COURT:  All right.

25

1    BY MR. UELAND:

2    Q.   Rather than logging on at their home computer, then, how

3    do cyber actors log on to the Internet, in your experience?

4    A.   Sometimes they'll use a proxy server.  Sometimes they

5    could go to a place that has open wifi.  They could log on

6    through remote or compromised terminals.  These are just a

7    couple of different ways in order to kind of hide their

8    traffic and the true origins of their traffic.

9    Q.   What's a proxy server?

10   A.   So a server is a powerful computer, essentially, that is

11   connected online.  A proxy server, if I'm using a proxy

12   server, the server I would send a request to.  The server

13   would act as my proxy, go out, seek the answers to those

14   requests, receive the request information, and then send it

15   back to me, all in order to shield where I'm coming from.

16            THE INTERPRETER:  The interpreter needs a

17   repetition of the last section --

18            THE COURT:  I'm sorry.  You want him to repeat the

19   last part?

20            THE INTERPRETER:  The last phrase.

21   A.   All in order to shield where I'm coming from.

22   BY MR. UELAND:

23   Q.   So in other words, using a proxy server shields a cyber

24   actor's true IP address.

25   A.   Yes.

1    Q.  And so to law enforcement, if someone was using a proxy,

2    law enforcement would be able to see the IP address of the

3    proxy server and not the true IP address of the cyber actor,

4    is that right?

5    A.  Yes.

6    Q.  Does a proxy server have to be geographically in the

7    same spot as the actor who's using it?

8    A.  No.

9    Q.  They could actually be in a different country than the

10   proxy server, is that right?

11   A.  Yes.

12   Q.  And do cyber criminals, in your experience, ever use

13   multiple proxy servers?

14   A.  Yes.

15   Q.  And why do they do that?

16   A.  It makes it easier to hide their true origins;

17   therefore, it makes it easier to hide from law enforcement.

18   Q.  Is it fair to say that using multiple proxies just adds

19   another layer between the true IP address and their criminal

20   activities online?

21   A.  Yes.

22   Q.  In your experience, do cyber criminals utilize online

23   payment processing companies?

24   A.  Yes.

25   Q.  What is an online payment processing company?

1   A.  It would be a company similar to a bank, except it might

2   not be -- it might not have a brick-and-mortar presence, and

3   they're used to move money from point A to point B.

4   Q.  So it's a way to facilitate the transfer of money

5   online.

6   A.  Yes.

7   Q.  PayPal is an example of online payment processing

8   company, is that right?

9   A.  Yes.

10  Q.  Now, are there other payment processing companies other

11  than PayPal that you're aware of in the course of your

12  investigations into cyber crime?

13  A.  Yes, there are.

14  Q.  And what are some of those other payment processing

15  companies?

16  A.  Payoneer, Paxum.

17  Q.  And do these payment processors -- when an individual

18  wants to open an account with one, do they have to provide

19  identification to the payment processing company?

20  A.  Yes.

21  Q.  And what sort of identification do they need to provide

22  to these online payment processing companies?

23  A.  They could provide a scanned passport.

24  Q.  And a name?

25  A.  Along with the scanned passport, they would provide a

1   name and address and the e-mail.

2   Q.  And you have talked about it being a scanned passport.

3   Is that e-mailed to the payment processing company?

4   A.  I would say it's probably from their website.  If you

5   apply with them online, you could attach it.

6   Q.  And how is, in your experience, verification done by the

7   online payment processing company?

8   A.  The processing company looks at the name that's entered,

9   compares it to the scanned passport, and that's about the

10  extent to which they go to verify that person is who they

11  say they are.

12  Q.  Does the communication take place online or face to

13  face?

14  A.  It's online.

15  Q.  In your experience, do cyber criminals ever use fake

16  passports to open these online payment processing accounts?

17  A.  Yes.

18  Q.  In your experience, is it common for a cyber criminal to

19  use a fake passport to open an online payment processing

20  account?

21  A.  Yes.

22  Q.  Keeping on the subject of fake passports, in your

23  experience as a cyber investigator, are you aware of private

24  forums online where fake passports or fake credentials are

25  available to a cyber criminal?

1    A.   I am.

2    Q.   And these forums are not available to the public

3    generally, is that right?

4    A.   Yes.

5    Q.   How does one get access to one of these private forums?

6    A.   You could be sponsored by a friend or a member, and your

7    friend or member, current member, would sponsor you and they

8    would be part of the vetting process for you to gain

9    membership or access.

10   Q.   Have you ever heard the term "bulletproof server" or

11   "bulletproof provider"?

12   A.   Yes.

13   Q.   And what does that mean?

14   A.   Typically, it's an ISP that is not friendly toward law

15   enforcement, so it's set up in order to help shield people

16   who are using it to commit crimes.  The maintainer of it

17   might not be willing to respond to law enforcement requests

18   and/or the maintainer might also forward information

19   regarding law enforcement when law enforcement seeks

20   requests having to do with that server.

21   Q.   In your experience, are sites where fake credentials can

22   be traded, fake passports, these private forums, are they

23   typically hosted on bulletproof providers?

24   A.   Yes.

25   Q.   In addition to allowing individuals to traffic in fake

1    identification documents, are these private forums used for

2    other criminal activity?

3    A.  Yes.

4    Q.  What kind of criminal activity?

5    A.  They could be used for trading of contraband, like child

6    porn.  They could be used to sell narcotics.  They could be

7    used to sell identities, as well as compromised credit card

8    numbers.

9    Q.  Okay.  You testified earlier that when they're opening

10   an online payment processing account, a cyber criminal would

11   use an e-mail address in order to conduct that business.

12   A.  Yes.

13   Q.  In your experience, do cyber criminals utilize multiple

14   e-mail addresses?

15   A.  Yes, they do.

16   Q.  And why do they do that?

17            THE INTERPRETER:  Your Honor, the interpreter

18   needs repetition of the last question and answer.

19   Q.  In your experience, do cyber criminals use multiple

20   e-mail addresses?

21   A.  Yes.

22   Q.  And why do they do that?

23   A.  To hide their true identity.

24   Q.  Now, Special Agent Couturier, are you aware that the

25   indictment in this case charges the defendant with

1    conspiring with other individuals to use a botnet known as

2    the Ebury botnet to engage in fraud?

3    A.  Yes.

4    Q.  And you've been advised about different aspects of the

5    investigation, is that true?

6    A.  Yes.

7    Q.  Are you aware whether the defendant has used multiple

8    aliases in connection with his criminal activities in this

9    case?

10   A.  Yes, he has.

11   Q.  Was one of those aliases Mikhail Katsap?

12   A.  Yes.

13   Q.  And how did the defendant use the identity Mikhail

14   Katsap in this case?

15   A.  He used that a/k/a to open a money transfer account

16   online.

17   Q.  With one of the payment processing companies that we

18   talked about?

19   A.  Yes.

20   Q.  And consistent with your earlier testimony, did the

21   defendant have to provide a digital-scanned passport in the

22   name of Mikhail Katsap?

23   A.  Yes.

24   Q.  And so he had a passport in that name.

25   A.  Yes.

1    Q.  In conducting the criminal activity in this case, are

2    you aware of whether or not the defendant used proxy

3    servers?

4    A.  Yes, he did.

5    Q.  In conducting his criminal activities in this case, are

6    you aware of whether or not the defendant used multiple

7    e-mail addresses to avoid detection?

8    A.  Yes, he did.

9    Q.  Now, the defendant was indicted in January of 2015, is

10   that right?

11   A.  Yes.

12   Q.  Do you know when he was arrested?

13   A.  I believe January 2016.

14   Q.  Well, he was extradited in January of 2016, but he was

15   arrested prior to that in the summer of 2015, is that right?

16   A.  Yes.

17   Q.  Okay.  And do you know where he was arrested?

18   A.  He was arrested in Finland.

19   Q.  And after he was --

20             THE COURT:  Let me interrupt here just so I'm

21   clear.  The indictment that I have indicates it was filed on

22   January 13, 2015.

23             MR. UELAND:  Yes.

24             THE COURT:  So you've initially asked the witness

25   if the defendant was indicted in January of 2015, and then

1    you talked about him being indicted I believe at a different

2    date in 2016.

3              MR. UELAND:  Your Honor, I'm sorry.  If I said

4    indicted, I meant extradited.

5              THE COURT:  Okay.  All right.  Do you want to

6    clear that up, please?

7              MR. UELAND:  I think we're going to with the next

8    series of questions, so --

9              THE COURT:  All right.  Okay.

10   BY MR. UELAND:

11   Q.  Following the defendant's arrest in Finland, did the

12   United States send a request to Finland to have the

13   defendant extradited to the United States to face charges?

14   A.  Yes.

15   Q.  Now, the defendant, is he a citizen of the United

16   States?

17   A.  No.

18   Q.  Do you know what country he's a citizen of?

19   A.  Russia.

20   Q.  And do you know whether or not Russia fought the

21   extradition proceedings in Finland?

22   A.  They did.

23   Q.  Special Agent, have you read any articles that have

24   talked about Russia's reaction to the defendant's arrest in

25   Finland and Finland's subsequent decision to extradite him

1    to the United States?

2    A.  I have.

3            MR. UELAND:  Your Honor, may I approach?

4            THE COURT:  Yes.

5    Q.  Special Agent, I've handed you three documents that have

6    been marked for identification purposes as Government

7    Exhibits 1, 2, and 3.  Have you seen those documents before?

8    A.  Yes, I have.

9    Q.  Government Exhibit 1 is a printout from the BBC website,

10   and it's an article entitled *Russian Rage Over Finland*

11   *Extradition to U.S.*," and it's dated January 8th of 2016, is

12   that right?

13   A.  Yes.

14           MR. UELAND:  Your Honor, I offer Government

15   Exhibit 1.

16           THE COURT:  Any objection?

17           MS. ATWAL:  Yes, Your Honor.  I object as to

18   relevance as to what the BBC's reporting on this case has

19   anything to do with this detention hearing.

20           THE COURT:  Do you wish to enlighten the Court on

21   the relevance of that BBC article?

22           MR. UELAND:  Your Honor, I think that

23   understanding the context in which the defendant comes to

24   the United States is important.  The defendant didn't

25   voluntarily submit to the jurisdiction of the United States.

1    He fought it, the Russian government fought it, and the

2    Russian government put political pressure on its neighbor,

3    Finland, in order to prevent his extradition to the United

4    States.  These factors, the Government would submit, or

5    these facts, rather, go to the defendant's flight risk.

6              THE COURT:  But tell me what the BBC article -- I

7    haven't read the article -- what relevance that has to these

8    factors that you've identified.

9              MR. UELAND:  Well, Your Honor, within the article

10   it talks about senior officials within the Russian

11   government specifically commenting on and denouncing the

12   actions of Finland and extraditing the defendant to the

13   United States.  And so obviously this defendant then has

14   come to the attention of its government.  The Russian

15   government doesn't believe that Mr. Senakh should be in the

16   United States facing these criminal charges.  The defendant

17   hasn't committed himself to the jurisdiction of the United

18   States voluntarily.  And so when you have a defendant in the

19   position that Mr. Senakh is in, that presents a risk of

20   flight.

21             THE COURT:  All right.  The objection's overruled.

22   I'll consider this article and give it what weight I think

23   is appropriate.

24             Go ahead.  You may proceed.

25

1    BY MR. UELAND:

2    Q.  Special Agent Couturier, the second article is from the

3    publication called ITAR-TASS, and it's dated January 29th,

4    2016.  And the headline of the article is *"Russian [Prime*

5    *Minister] Says U.S. Practice to Arrest Other Countries'*

6    *Nationals Looks Like 'Criminal Activity.'"*

7            THE INTERPRETER:  Your Honor, the interpreter

8    [inaudible].

9    Q.  *"Russian [Prime Minister] Says U.S. Practice to Arrest*

10   *Other Countries' Nationals Looks Like 'Criminal Activity.'"*

11           Is that right?

12   A.  Yes.

13           MR. UELAND:  Your Honor, the Government offers

14   Government Exhibit 2.

15           THE COURT:  Any objection?

16           MS. ATWAL:  Yes, Your Honor.  I object again on

17   the relevance of a newspaper article and Russian politics

18   involved in this case.

19           THE COURT:  The objection's overruled.  Again, I

20   will consider it and the appropriate weight it should be

21   given.

22   BY MR. UELAND:

23   Q.  Special Agent, a third article is an article from

24   Reuters dated August 27th, 2015, and the title of the

25   article is *"'Witchhunt':  Moscow Slams Finland's Arrest of*

1  *Russian Citizen on U.S. Request*," is that right?

2  A.  Yes.

3          MR. UELAND:  I offer Government Exhibit 3.

4          THE COURT:  Any objection?

5          MS. ATWAL:  I continue in my objection as to

6  relevance, Your Honor.

7          THE COURT:  The objection is overruled.

8  BY MR. UELAND:

9  Q.  Have you reviewed those articles, Special Agent?

10  A.  I have.

11  Q.  And in those articles, are there quotes from senior

12  Russian officials discussing the defendant's arrest in

13  Finland and the decision to extradite him to the United

14  States?

15  A.  Yes, there are.

16  Q.  And is it fair to say that Russia -- these senior

17  officials are not happy with Finland's decision to extradite

18  to the United States?

19  A.  Yes.

20  Q.  Special Agent, have you been made aware of whether or

21  not Finland is facing political pressure from Russia --

22          MS. ATWAL:  Objection.  Relevance.

23          THE COURT:  Overruled.

24  Q.  -- as a result of its decision to extradite the

25  defendant?

1    A.  Yes, I'm aware.

2    Q.  And are they?

3    A.  They are.

4            MR. UELAND:  No further questions, Your Honor.

5            THE COURT:  All right.  Ms. Atwal.

6            MS. ATWAL:  Your Honor, may I just have a moment?

7            THE COURT:  Certainly.

8        (Pause)

9                    IN OPEN COURT

10           MS. ATWAL:  Your Honor, I just asked the

11   interpreter to move closer to me because I know I have a

12   tendency to talk fast and this way hopefully I can see the

13   interpreter waving to me.

14           THE COURT:  All right.  We'll both try to get your

15   attention.  Before you do that, can you hand me those

16   exhibits, please?

17           THE WITNESS:  Yes, ma'am.

18           THE COURT:  All right.  You may proceed.

19                   **CROSS-EXAMINATION**

20   BY MS. ATWAL:

21   Q.  Good morning, Agent.

22   A.  Good morning.

23   Q.  Agent, how long have you been working in the Cyber

24   Squad?

25   A.  Since approximately 2010.

1          THE COURT:  And again, you'll have to watch to see

2     if the interpreter is done interpreting Ms. Atwal's question

3     before you give the answer.  Thank you.

4          THE WITNESS:  Yes, ma'am.

5          THE COURT:   Go ahead, Ms. Atwal.

6     Q.  You were asked many questions about a person hiding

7     their identity when they are committing a cyber crime.

8     A.  Yes.

9     Q.  You are aware that investigators can still find an

10    electronic foot path for criminal activity.

11    A.  Yes.

12    Q.  And in fact, it's your understanding that that is what

13    was done in this case to lead to the arrest of Mr. Senakh.

14    A.  Yes.

15    Q.  Can you tell us what your involvement in this case has

16    been?

17    A.  I'm not the case agent, so my involvement has been

18    reviewing the indictment, and that's -- and then this

19    detention hearing.

20    Q.  You were asked if Mr. Senakh had used multiple e-mails,

21    correct?

22    A.  Yes.

23    Q.  And your answer was yes.

24    A.  Yes.

25    Q.  And you're basing that on reading the indictment,

1    correct?

2    A.  Yes.

3    Q.  In other words, you don't know how Mr. Senakh used

4    multiple e-mails, or when he used them, or for what purpose,

5    true?

6    A.  I have how he used them as far as what the indictment

7    said, but outside of the scope of the indictment, I wouldn't

8    know how he used them.

9    Q.  You were asked if he had used multiple aliases, correct?

10   A.  Yes.

11   Q.  You're basing your answer only on what is said in the

12   indictment, correct?

13   A.  Yes.

14   Q.  Are you aware that when Mr. Senakh was arrested, he was

15   interrogated by the FBI?

16   A.  Yes.

17   Q.  Are you aware of what was said in that conversation?

18   A.  No.

19   Q.  Let's talk about these articles, Government Exhibit 1, 2

20   and 3.  Did you read each of those articles?

21   A.  Yes, I did.

22   Q.  And in those articles, the Russians were concerned about

23   several things, correct?

24   A.  Yes.

25   Q.  One was the harsh punishment the U.S. could impose on

1    one of their citizens, correct?

2    A.  Yes.

3    Q.  They were talking about the inhumane criminal justice

4    system of the United States, true?

5    A.  True.

6    Q.  Another reason they were upset is because Russia was not

7    informed of Mr. Senakh's arrest, true?

8    A.  True.

9    Q.  And a Russian diplomat insinuated there's an agreement

10   between Russia and the United States if each other's

11   citizens are being investigated, true?

12   A.  I don't remember that part.

13   Q.  Sir, I refer you over to the article that is entitled

14   *"Witchhunt."*

15            THE COURT:  That would be Exhibit 3?

16            MS. ATWAL:  Yes, Your Honor.

17            THE COURT:  All right.

18            MS. ATWAL:  May I approach, Your Honor?

19            THE COURT:  Yes.

20            THE INTERPRETER:  Your Honor?

21            THE COURT:  Yes.

22            THE INTERPRETER:  Mr. Senakh is trying to get my

23   attention.

24            THE COURT:  Okay.

25            MS. ATWAL:  May I, Your Honor?

1         THE COURT:  Yes.

2         (Discussion off the record)

3              IN OPEN COURT

4         THE COURT:  We're back on the record.

5    BY MS. ATWAL:

6    Q.  So do you recall somebody from the Russian Ministry

7    being upset about them not being told about Mr. Senakh's

8    alleged criminal activity?

9    A.  Yes.

10   Q.  He further insinuated there was an agreement between

11   Moscow and Washington to discuss such things, correct?

12   A.  Yes.

13   Q.  When a foreign citizen is arrested and another country

14   wants jurisdiction, they have a right to fight that

15   extradition, correct?

16   A.  I'm presuming so, yes.

17   Q.  That is somebody's legal right.

18   A.  I don't know all the laws of other countries.

19   Q.  Well, let's talk about Finland.  Mr. Senakh was

20   represented by an attorney?

21   A.  Mm-hm.

22   Q.  Yes?

23   A.  You're telling me.  I don't know if he was or not.

24   Q.  Okay.  You're aware there was a court order issued?

25   A.  No.

1    Q.  Do you know how he ended up in the United States?

2    A.  Extradition paperwork that I think went from us to

3    Finland.

4    Q.  And do you know if a court ordered him to come to the

5    United States?

6    A.  I think the extradition paperwork was from a court, so

7    yes, ma'am.

8    Q.  Okay.  And that's a legal document, correct, between two

9    countries?

10   A.  Yes.

11   Q.  Finland borders Russia, correct?

12   A.  Yes.

13   Q.  And you are aware that this indictment came down in

14   January of 2015, correct?

15   A.  Yes.

16   Q.  An arrest warrant was issued in August of 2015.

17   A.  Yes.

18   Q.  And Mr. Senakh was arrested within a week of that

19   warrant, correct?

20   A.  I'm not sure of the timeline between when the warrant

21   came out and when he was arrested.

22   Q.  You know he was arrested in August, correct, of 2015?

23   A.  Sounds right.

24   Q.  He was arrested coming from from Finland to Russia.

25   A.  I thought it was leaving Finland to go back to Russia

1    that --

2    Q.  Okay.  Leaving Finland going into Russia, correct?

3    A.  That was my understanding, yes, ma'am.

4    Q.  To do that he has to have a passport, correct?

5    A.  I think so.

6    Q.  In fact, agents took that passport from him, correct?

7    A.  I'm not sure of the whereabouts of or who took the

8    passport.

9    Q.  Did you have a chance to speak to the case agent about

10   this case?

11   A.  I did.

12   Q.  Did you ask him anything about the facts of Mr. Senakh's

13   arrest?

14   A.  No.

15   Q.  Did you ask him whether or not Mr. Senakh attempted to

16   flee?

17   A.  I did not.

18   Q.  If he had, is that something you would have been told?

19   A.  I'm presuming so.

20   Q.  If he had a weapon on him, would you have been told

21   that?

22   A.  I'm presuming so.

23   Q.  And that information was not relayed to you, correct?

24   A.  That's right.

25   Q.  Are you aware that Mr. Senakh has family living in

1    Russia?

2    A.  Yes.

3    Q.  How do you know that?

4    A.  It came up in conversation with the case agent.

5    Q.  Were you also made aware that he has a sister that lives

6    in Finland?

7    A.  No.

8    Q.  The case agent didn't tell you that?

9    A.  If he did, I don't recall.

10   Q.  Did the case agent tell you whether or not any false

11   identification, such as a passport, was found on Mr. Senakh

12   at the time of his arrest?

13   A.  He did not.

14   Q.  Now, you were asked whether or not Mr. Senakh had used a

15   fake passport online; do you remember that question?

16   A.  I do.

17   Q.  Are you again basing that on the indictment?

18   A.  Yes.

19           MS. ATWAL:  Your Honor, may I have a moment?

20           THE COURT:  Yes.

21       (Pause)

22                     IN OPEN COURT

23           MS. ATWAL:  Your Honor, I have nothing further.

24           THE COURT:  All right.  Thank you very much.

25           Mr. Ueland, anything further on behalf of the

1    Government?

2             MR. UELAND:  Thank you, Your Honor.

3                        **REDIRECT EXAMINATION**

4    BY MR. UELAND:

5    Q.  Special Agent, on cross-examination, counsel for the

6    defendant asked you some questions about Government Exhibit

7    3.  She asked you whether or not a senior official within

8    the Russian foreign ministry had implied that there was an

9    agreement between Russia and the United States with respect

10   to anti-criminal cooperation.  Do you remember that

11   question?

12   A.  Yes.

13   Q.  Now, that same article reports that that same senior

14   official stressed that Russia objected to the defendant

15   being extradited to the United States, isn't that true?

16   A.  Yes.

17   Q.  And there was no extradition treaty between the United

18   States and Russia --

19             MS. ATWAL:  Objection.  Leading.

20             THE COURT:  Please rephrase it as a nonleading

21   question and find out --

22   Q.  Are you aware of whether or not there's an extradition

23   treaty --

24   A.  I am not.

25   Q.  I'm sorry.  Let me finish so the record is clear --

1    between the United States and Russia?

2    A.  I am not.

3    Q.  Okay.

4            MR. UELAND:  No further questions, Your Honor.

5            THE COURT:  Anything further, Ms. Atwal?

6            MS. ATWAL:  I'm sorry, Your Honor.

7                      **RECROSS-EXAMINATION**

8    BY MS. ATWAL:

9    Q.  Agent, I just want to be clear.  Are you saying you

10   don't know whether or not there's an extradition treaty, or

11   are you saying there doesn't exist one?

12   A.  I'm saying I don't know if there exists one.

13   Q.  Thank you.

14           THE COURT:  Anything further, Mr. Ueland?

15           MR. UELAND:  No, Your Honor.

16           THE COURT:  Thank you.  You may step down.

17           Does the Government have any other evidence it

18   wishes to submit?

19           MR. UELAND:  No, Your Honor.

20           THE COURT:  Ms. Atwal, do you have any evidence

21   that you wish to submit on behalf of your client?

22           MS. ATWAL:  I do not have a witness, Your Honor,

23   but I do have information I would like to proffer.

24           THE COURT:  All right.  Let me hear the proffer

25   first before I hear arguments from counsel.

1          MS. ATWAL:  Your Honor, I have been in contact

2     with Mr. Senakh's sister and wife.  His sister lives in

3     Finland and verified to me that she's been living there and

4     is a property owner in Finland.  His wife verified that she

5     does live in Russia with her husband, Mr. Senakh.  They have

6     been married for 16 years.  They have a child who is age 13.

7     She verified that Mr. Senakh's parents also live in Russia.

8     They are divorced.  His maternal grandparents also reside in

9     Russia.  She further verified that he has a high school

10    education and a college education.  She verified that he

11    does not do drugs and is a social drinker.  She verified

12    that they have lived in their home for the past three years.

13    Prior to that date they lived in an apartment for nine

14    years.

15          She sent me documents that are all in Russian.  I

16    had asked the interpreter to take a take a look at those

17    documents.  One document verifies a residence in Russia with

18    Mr. Senakh's name on there along with his wife and his

19    child.

20          I also was given a marriage certificate that

21    verifies the marriage from the year 2000.

22          Further, I did go to Sherburne County Jail and

23    looked in their property.  I was given a passport that I

24    wish to enter as Defense Exhibit 1, which shows Mr. Senakh's

25    face and his name and place of birth.  There's also a note

1    in there from the Department of Homeland Security from

2    February 6, 2016.  Otherwise, Mr. Senakh tells me this is

3    his true, correct passport other than the stapled sheet from

4    Homeland -- or Department of Homeland Security.

5              THE COURT:  Are you offering that passport at this

6    time?

7              MS. ATWAL:  I am, Your Honor.

8              THE COURT:  Any objection?

9              MR. UELAND:  Your Honor, I do object to this

10   becoming a court exhibit.

11             THE COURT:  I'm sorry, a what?

12             MR. UELAND:  The Government does object to this

13   becoming a court exhibit.  I don't know where this passport

14   would reside then in the event that it's entered as an

15   exhibit in this case.  Maybe we could take a photograph of

16   it or scan it and enter that instead.  It just seems to me

17   that it would be potential evidence in the trial in this

18   case.

19             THE COURT:  Any objection to the Court making a

20   copy of that and then we mark the copy of the exhibit as an

21   exhibit in this detention hearing?

22             MS. ATWAL:  That's fine, Your Honor.

23             THE COURT:  All right.  Then on the assumption

24   that what will be entered as an exhibit is a copy of the

25   passport, any objection to entry of the exhibit?

1          MR. UELAND:  No, Your Honor, no.

2          THE COURT:  All right.  The copy of the passport

3    will be made and will be entered in as an exhibit in this

4    case.

5          MS. ATWAL:  Your Honor, I should also note there's

6    another sheet attached to it which is an inmate's release of

7    personal property from Sherburne County Jail.  It bears my

8    signature as me picking up the passport.

9          THE COURT:  What is your intention just so I know

10   in terms of -- is it your intention then to return the

11   original passport and whatever sheets are in it to Sherburne

12   County?

13         MS. ATWAL:  No, Your Honor.  If the Court follows

14   my recommendation and releases him, I would then turn over

15   the passport to Probation.

16         THE COURT:  All right.  And if the Court were to

17   grant the Government's motion for detention, what is your

18   intention with respect to that exhibit?

19         MS. ATWAL:  I will keep it with me.

20         THE COURT:  All right.  Well, for now, you're the

21   one who picked up the exhibit and that's fine.  Obviously if

22   the Government has an issue about that or believes that it

23   is potential evidence, presumably counsel for the Government

24   and Ms. Atwal will discuss the handling of that particular

25   passport.

1          MS. ATWAL:  For the time being, however, Your

2     Honor, I would ask that the Court have the passport to look

3     at in making its decision.

4          THE COURT:  Certainly.  In fact, I'll be taking a

5     short break and during that break I will make a copy of

6     this.  And I'm not going to mark -- let's not mark the

7     passport as an exhibit, but rather we'll mark the copy.

8          MS. ATWAL:  May I approach, Your Honor?

9          THE COURT:  Yes.  And that'll be marked -- the

10    copy will be marked along with the Department of Homeland

11    Security card that is stapled in here as Defendant's Exhibit

12    1.

13         MS. ATWAL:  Thank you, Your Honor.

14         THE COURT:  Thank you.

15         MS. ATWAL:  Aside from that, Your Honor, I have

16    nothing else to proffer.  I would simply have argument.

17         THE COURT:  All right.  Then let me hear first

18    from Mr. Ueland, if I can.

19         MR. UELAND:  Your Honor, the Government agrees

20    with the recommendation from Probation that there are no

21    conditions or combination of conditions that will reasonably

22    assure the defendant's appearance in court and that

23    detention is appropriate in this case.

24         Section 3142(g) directs this Court to consider,

25    among other things, the nature and circumstances of the

1    offense charged.  Here the defendant has been charged by a

2    speaking indictment that sets forth specific allegations

3    that this defendant has conspired with one or more

4    individuals in deploying malware known as Ebury.  This

5    malware surreptitiously exfiltrates user names and passwords

6    through the computers that it's installed on, turning those

7    computers into bots, or robots, that are under the control

8    of the defendant and his co-conspirators.

9          The indictment alleges that the defendant and his

10   co-conspirators used this network of compromised bots to

11   engage in fraud.  And as set forth in the indictment, it's

12   alleged that the defendant and his co-conspirators have

13   obtained more than $1 million in fraudulent proceeds.

14         For these actions, the defendant is charged with

15   conspiracy to commit violations of the Computer Fraud and

16   Abuse Act and to commit wire fraud, and he's also been

17   charged with substantive counts of violating the Computer

18   Fraud and Abuse Act and substantive counts of wire fraud.

19         Importantly, during the commission of the offense,

20   the defendant is alleged to have used numerous aliases.  The

21   indictment lists Mikhail Katsap, Andrey Rasputnikov, and

22   Stepan Demidov as just three of the aliases that the

23   defendant utilized.

24         Today this Court heard testimony from Special

25   Agent Couturier that the defendant used a passport under the

1     identity Mikhail Katsap as a part of his commission of

2     offenses in this case.

3              Clearly the conduct alleged in the indictment

4     shows that the defendant has engaged in sophisticated

5     behavior and the threat posed by the defendant is evident.

6              Your Honor, there's news articles abound about the

7     threat posed by foreign hackers.  Before coming to the

8     detention hearing today, I read an article dated May of 2015

9     that talked about Russia's greatest weapon may be its

10    hackers, and it talked about a U.S. intelligence committee's

11    worldwide threat assessment report talking about the

12    sophistication, inventiveness and programming power

13    displayed by Russian hackers.

14             The offense is sophisticated, the defendant's

15    profited from the offense and may have access to funds

16    through the online payment processing companies on the

17    Internet.  The offense itself weighs in favor of detention.

18             As I previewed for the Court when talking about

19    the articles, it's the Government's position that the Court

20    should also consider the circumstances of how the defendant

21    got here.  The defendant was indicted on January 13th, 2015.

22             And just to correct a statement by Ms. Atwal, the

23    arrest warrant was issued at that same time out of this

24    district court.  The defendant was arrested on that warrant

25    on August 8th, 2015 in Finland.

1          On September 15th of 2015, the United States sent

2    its extradition request to Finland.  Russia objected to the

3    defendant being extradited to the United States and a

4    rejoinder was filed in Finnish court on his behalf, arguing

5    strenuously against extradition to the United States.

6          At the same time of his arrest and during

7    throughout the pendency of the extradition proceedings,

8    Russian officials were highly critical of the actions of the

9    United States and Finland.

10          As you can see from the articles, Your Honor,

11    senior Russian officials with the foreign ministry have

12    characterized the actions of the United States as a

13    witchhunt and, as that one foreign ministry official

14    Mr. Dolgov stressed, Moscow objects to the defendant being

15    extradited to the United States.

16          Despite facing political pressure from its larger

17    neighbor, on January 5th, 2016, Finland agreed to extradite

18    the defendant to the United States, and reaction from Russia

19    was swift and it came from on high.  Russian Prime Minister

20    Dmitry Medvedev denounced the decision, characterizing it as

21    immoral and compared it to criminal activity.  Finland,

22    which shares an 833-mile long border with Russia, has paid a

23    high political price extraditing the defendant to the United

24    States.

25          The defendant has no ties to the United States at

1    all.  Indeed, all the information proffered by the defendant

2    shows that the defendant's ties are in Russia almost

3    exclusively with the exception of a sister who lives in

4    Finland.  Because he's a Russian citizen, Pretrial Services

5    has been unable to verify the defendant's employment or to

6    determine whether or not the defendant has a criminal

7    record.  The defendant's a black box, in essence.

8            Assuming that the defendant does not have a

9    criminal record as the United States has, the defendant's

10   advisory guideline range in the event that he's convicted

11   and decides to go to trial is 188 to 235 months.

12           THE INTERPRETER:  From the interpreter, if he

13   could give the numbers.

14           MR. UELAND:  Of course.  It's 188 to 235 months.

15           The defendant, who's already shown through his

16   actions that he doesn't submit to the jurisdiction of this

17   Court, truly has every incentive to flee.  This Court heard

18   testimony about the ease with which a defendant can get

19   false identification documents that would facilitate flight

20   from the United States.  The Government would argue that

21   this is even easier for a person who has a demonstrated

22   capability to obtain such documents.

23           As this Court is well aware here in the District

24   of Minnesota, we have an international border to the north.

25   In the event that the defendant fled to Canada, the United

1    States has advised that the United States would need to

2    re-initiate extradition proceedings with Canada.  Counsel is

3    advised that that process is extremely lengthy, it would

4    take an additional two to three years, and that there is no

5    guarantee of success.

6            Given Russia's position with respect to this

7    defendant, it is the United States' expectation that Russia

8    would once again fight extradition from Canada to the United

9    States, and indeed, I'm advised that Canada's position in

10   the absence of the United States initiating extradition

11   proceedings would be to deport the defendant to his country

12   of citizenship, in other words, to Russia.  With such easy

13   access to an international border where the defendant could

14   find friendlier treatment, the United States submits that

15   the defendant has even more incentive to flee.

16           Finally, Your Honor, there are other confederates

17   that were involved in this case and the investigation in

18   this matter continues, and these are individuals that the

19   defendant could contact in the event that he was released.

20           For all these reasons, the United States requests

21   that this Court order the defendant detained pending trial

22   in this matter.

23           THE COURT:  Thank you.  Ms. Atwal.

24           MS. ATWAL:  To punish somebody for exercising

25   their legal right to fight extradition is unconscionable,

1    and perhaps when Russia was concerned about one of its

2    citizens, this is exactly what they were talking about.

3              The articles, which I believe are not relevant,

4    speak of Russia being concerned about the punishment, the

5    inhumane punishment one of their citizens may receive in the

6    United States.

7              The Russian government is upset because the United

8    States Government did not inform them one of their own was

9    being investigated.  That is above Mr. Senakh's head.

10   That's pure politics and should not factor into this Court's

11   decision.

12             My understanding of reading the extradition rights

13   is that Russia does have a treaty with the United States

14   from sometime in 1998 to 1999 that does allow extradition.

15   And in fact, a Russian diplomat discussed that in one of the

16   articles.

17             There are four factors that 18 U.S.C. 3142(g)

18   suggest the Court review in determining whether or not

19   Mr. Senakh should be released or kept in custody.

20             One is the weight of the evidence.  The agent that

21   testified could only tell us what was inside the indictment.

22   He could not tell us why it is that the Government believes

23   or how the Government believes Mr. Senakh used an alias, how

24   or why he used fake e-mail addresses.  They didn't enter

25   into evidence any exhibits of false passports.  Rather,

1    Mr. Senakh offered his own passport with his true and

2    correct name, with his picture.  Included in that passport

3    are stamps from other countries, such as Finland.  In order

4    for him to go into other countries, obtain visas, he could

5    not have a criminal record.  And I refuse to believe that

6    given this case is over a year old, the FBI was not able to

7    determine whether or not Mr. Senakh has a criminal history.

8    To me that suggests he has no prior criminal history.

9         Another factor the Court should look at is the

10   nature and circumstances of the offense charged.  This is

11   not a crime of violence.  This is not an act of terrorism.

12   This does not involve a minor victim, does not involve

13   drugs, does not involve a firearm.  Rather, the allegation

14   is a cyber crime.

15        If the Court releases Mr. Senakh to a halfway

16   house here in the state of Minnesota, the Court can direct

17   him to have no access to a computer or to the Internet.

18   They don't have that at the halfway house.  That's easy.

19   The tools of cyber criminals is the Internet and is a

20   computer.  Take that away if the Court is concerned.

21        The third factor is the history and

22   characteristics of the person involved.  This is an

23   individual which I proffer to the Court has lived in Russia

24   for most of his life.  He's a high school graduate and a

25   college graduate.  He's been married for 16 years, has lived

1      in the same residence for the past three years.  Prior to

2      that he lived in the same residence for nine years.  He's a

3      father to a 13-year-old son.  As he stated to Probation, he

4      has no drug or alcohol problems and no mental health issues.

5      His sister lives in Finland, and as the Court will see,

6      there are many stamps to Finland in his passport.

7              The other thing the Court in looking at the

8      history and characteristics of a person, the statute

9      suggests the Court look at whether or not this person's on

10     probation or whether they are under any type of court

11     supervision.  Again, there's no evidence that he is on

12     probation or under court supervision, because he's not.

13             The indictment in this case came out in January of

14     2015.  I will believe Mr. Ueland when he says the arrest

15     warrant was issued soon after, but we do know that the

16     extradition, telling another country that Mr. Senakh is

17     wanted, did not happen until August of 2015, and within a

18     week Mr. Senakh was arrested.  That indicates that he's not

19     a risk to flee.  He was caught almost immediately.  He was

20     arrested with his true and correct name, his passport.

21     There's no indication he attempted to flee when he was

22     arrested.  There's no indication he had any weapons on him

23     at that time.  We didn't even hear any testimony that there

24     was any tools of the trade, whether there was a computer

25     with him, whether there was other documents to suggest he's

 1     involved in cyber criminal activity.

 2             In *United States vs. Beckham* -- or *Berkman,*

 3     sorry -- B-E-R-K-M-A-N, 13-273 (SRN/JJK) --

 4             THE COURT:  I'm sorry.  13 -- you're giving me the

 5     name of a case; is that what you're doing?

 6             MS. ATWAL:  Yes, sorry, Your Honor.

 7             THE COURT:  All right.  Give me the name or the

 8     defendant's name.

 9             MS. ATWAL:  It's *United States vs. Berkman,*

10     B-E-R-K-M-A-N, Criminal Number 13-273 (SRN/JJK).

11             In that case, numerous defendants have been

12     charged with mail fraud, conspiracy to violate the federal

13     Food & Drug Act, along with some miscellaneous other

14     offenses, including money laundering.

15             The allegations in that offense is that there was

16     a pharmaceutical online conspiracy.  Some of the defendants

17     are naturals from a different country with zero ties to the

18     state of Minnesota.

19             One person in particular is defendant Moran,

20     M-O-R-A-N, Oz, O-Z.  Despite having no ties to the United

21     States or to the state of Minnesota, he was released on

22     August 5th, 2014 and remains on conditional release.

23             I will note that there was a bond posted in

24     addition to other releases that the judge felt needed to be

25     imposed.

1          Another individual with the last name that's

2     spelled A-G-H-A-E-G --

3          THE COURT:  H-G-H --

4          MS. ATWAL:  I'm sorry -- A-G-H-A-E-G-B-U-N-A --

5     was released on September 19th, 2014.  That individual is a

6     citizen, again, of a different country.  He was released on

7     a $25,000 unsecured bond and placed in a halfway house.

8     I've been informed by his attorney that more recently he was

9     moved into an apartment.

10          All of these individuals also had GPS monitoring

11     placed on them.

12          In other words, Your Honor, people that don't have

13     ties to this particular community or even the United States

14     have been released by other judges unrelated to other cases.

15          Again, placing Mr. Senakh at a halfway house with

16     GPS and with conditions that he not use the computer or the

17     Internet will assure the community's safety, take care of

18     factor number one, which is the nature and circumstances of

19     the offense, and factor number four, the nature and

20     seriousness, the danger of the person would pose if

21     released.

22          One of the factors is the weight of the evidence

23     against the person which I cannot speak to since I only have

24     the indictment.

25          Given his background, given the way the case has

1    proceeded, I would ask that the Court release him with the

2    conditions I have asked for.

3            I will also tell the Court that Mr. Senakh has

4    been in custody at Sherburne County Jail, and when I meet

5    with him, he is in shackles every single time.  In order for

6    him to turn a piece of paper, he has to stand up because the

7    cuffs are so close to his body.  I cannot even imagine going

8    through thousands of pages of discovery with him handcuffed

9    the entire time.

10           When I asked Sherburne County why this was, they

11   were not able to tell me.  Informally, I was told it could

12   be a language barrier, that because he doesn't speak

13   English, he cannot be put in the regular population and

14   therefore is placed in segregation.  And if someone's placed

15   in segregation, the rules are that when they move from that

16   area, they must be cuffed at all times.

17           Respectfully, Your Honor, again, I would ask that

18   the Court release him with the very strict conditions that I

19   suggest, such as 24-hour lockdown, GPS monitoring, no access

20   to the Internet, no computer access, no phone access that

21   has Internet capabilities on it.  I do think that would

22   assure that he will not flee, keep the community safe, and

23   it would be the least restrictive way to make sure all those

24   goals are met.

25           THE COURT:  Thank you.  Mr. Ueland, if you could

1    come to the podium, please.

2         Obviously I will give you an opportunity to

3    respond to Ms. Atwal's argument, but I would like to hear

4    from you why what she is proposing, which is release to a

5    halfway house with a GPS, 24-hour lockdown, no access to the

6    Internet, no access to any phone that would have Internet or

7    electronic communication capabilities other than to speak on

8    the phone, why those restrictions would not address both

9    safety to the community and also the likelihood that he

10   could flee.

11        MR. UELAND:  Because, Your Honor, I've had

12   defendants who have violated those very conditions and have

13   fled.  I can think of two defendants right off the top of my

14   head who had 24-hour restrictions with a GPS bracelet, and

15   within hours of being placed at the halfway house had cut

16   off that bracelet and had fled to the Red Lake Indian

17   Reservation, one defendant.

18        Another defendant, while awaiting sentencing, Your

19   Honor --

20        THE COURT:  Go slow so that we can make sure that

21   the interpreter can interpret.

22        MR. UELAND:  I'm sorry -- removed his GPS device,

23   fled the United States and needed to be -- or he wasn't

24   extradited.  He was removed from a country and then the

25   United States was able to arrest him upon his expulsion from

1    that country.

2          I've been advised by Probation and Pretrial

3    Services that the monitoring by the GPS bracelets isn't on a

4    24-hour basis and that once that bracelet's cut off, there's

5    a significant lag between that time and the time that

6    someone's notified of that bracelet being removed.

7          Simply put, for a defendant who has a powerful

8    incentive to flee, these bracelets are of little deterrent

9    value.

10          THE COURT:  What about the 24-hour lockdown?

11          MR. UELAND:  Again, Your Honor, a 24-hour

12    lockdown, you know, in my experience, people have walked

13    away from halfway houses in those scenarios.

14          THE COURT:  But, in those scenarios, then,

15    presumably the halfway house immediately notified Probation

16    or the supervising officer that they had violated their

17    24-hour lockdown, unlike, apparently, what you're saying

18    you've been told happens if there is a cutting off of the

19    GPS bracelet.

20          MR. UELAND:  And then law enforcement has to

21    engage in a hunt for the fugitive at this point.

22          THE COURT:  Anything else you wish to address as

23    to Ms. Atwal's proposal?

24          MR. UELAND:  Well, Your Honor, not with respect to

25    the proposal, but I do take issue with the defendant using

1    another case as an example.  The mere fact -- I'm sorry --

2    other individuals who don't have ties to the United States

3    have been ordered released, it's not determinative of the

4    issues before this Court with respect to this defendant and

5    the crimes that he's been charged with.  I mean, the

6    Government could easily proffer other examples of cases

7    where a defendant does have ties to the United States but

8    has fought extradition from another country and has been

9    ordered detained because of the flight risk.  In fact,

10   defense counsel is aware of just one of those cases.  She

11   represented a co-defendant in the matter of Mahamud Said

12   Omar, which is 09-242.  It was before Chief Judge Davis.  In

13   that case that defendant had a job in the District of

14   Minnesota.  He was in the Netherlands, fought his

15   extradition to the United States and was returned to the

16   United States.  Now, granted, that case was a case involving

17   terrorism.  Mr. Omar was indicted for providing material

18   support to people who were traveling to fight with a

19   terrorist organization.  But his detention was also based on

20   the fact that he was a risk of flight as demonstrated by his

21   decision to fight extradition.

22        Mr. Senakh is more similarly situated to Mr. Omar

23   than he is to the defendants in the case that Ms. Atwal

24   noted.

25        For all the reasons that the Government has

1    suggested, detention is appropriate in this case.  It's

2    what's being recommended by Probation in this matter and he

3    should be detained pending trial.

4         THE COURT:  All right.  Thank you very much.

5    We're going to take a short recess while I consider the

6    evidence that has been presented to me, the arguments of

7    counsel and also the -- when I talk about the evidence, the

8    exhibits and the passport as well, so we'll take a short

9    recess.  Thank you very much.

10        (Recess taken at 12:24 p.m.)

11                        *    *    *    *

12        (12:44 p.m.)

13                     IN OPEN COURT

14        THE COURT:  First of all, let me return the

15    original passport to Ms. Atwal, and Mr. Hanson is going to

16    mark one of the copies of the passport as Defendant's

17    Exhibit 1 and then copies of that exhibit will be given to

18    counsel for both the United States and the defendant.

19        Having considered the evidence that was presented

20    here today, having reviewed the indictment, having

21    considered the exhibits, including the defendant's passport

22    as well, and the arguments of counsel, I have made the

23    decision to grant the Government's motion for detention.

24        I reach that conclusion because I have determined

25    that there are no conditions of release or combination of

1    conditions that I could put in place that would reasonably

2    ensure the safety of this community and the defendant's

3    continued appearance here in court.

4         I have considered very seriously the proposal on

5    behalf of the defendant by Ms. Atwal that the defendant be

6    placed in a halfway house with basically a 24-hour lockdown

7    with no access to phone or computer and a GPS monitoring

8    system.

9         I've considered as to whether I am sufficiently

10   satisfied that both the safety of the community and his

11   continued appearance could be reasonably ensured and I have

12   concluded that that is not a viable alternative.

13        I've reached that conclusion based on the four

14   factors that are set forth in 18 U.S.C., Section 3142, which

15   include the nature and circumstances of the offense charged.

16   Obviously, to me anyway, these charges are very, very

17   serious charges that have had enormous impact on many, many

18   people in terms of accounts and also, as alleged, to great

19   financial remuneration to the defendant.

20        I've considered the weight of the evidence that

21   has been set forth in the indictment and in particular at

22   paragraphs 20 through 52 of the indictment, which lay out in

23   great detail the weight of the evidence or the evidence that

24   has been garnered to date and presented in the indictment,

25   and find that the weight of that evidence as set forth in

1    the indictment suggests, again, a very serious crime has

2    been committed and that's the allegation, and weigh very

3    strongly in terms of the Court's determination about not

4    only the likelihood or the incentive for the defendant to

5    flee, but in the event he were able to, for example, leave

6    the halfway house and was not immediately apprehended, the

7    safety of the community would be not only threatened, but

8    his ability to flee I think would be very great.

9         The allegation is this defendant is a very, very

10   sophisticated individual when he has access to the computers

11   in terms of making contact and obtaining funds on his

12   behalf, substantial amounts of money as alleged in the

13   indictment.

14        When I look at the third factor, the history and

15   characteristics of the person, the allegations in the

16   indictment indicate that more than a million dollars has

17   been received by the defendant here, so the potential for

18   significant financial resources to flee are present.  He

19   clearly has no residence in the community and no community

20   ties to the state of Minnesota.

21        The other factors that are set forth in Section

22   3(a) did not weigh in as I looked at his history and

23   characteristics, but the extent of his potential financial

24   resources and lack of ties to this community again speak to

25   me regarding in the event he were to leave the halfway

1     house, that he certainly has the means to flee.

2

3             Lastly, I looked at the nature and seriousness of

4     the danger to any person or the community that would be

5     posed by his release, and given the evidence that has been

6     submitted or the facts that are alleged in the indictment, I

7     have no doubt in my mind that if the defendant were to

8     regain access to electronic devices, to the computer, to the

9     Internet, that the same sort of great harm which is alleged

10    in the indictment could very likely occur again and very

11    quickly as well.

12            So, for all of those reasons, I have concluded

13    that I must grant the motion for detention.  And I would ask

14    that the Government prepare an order consistent with my

15    ruling here from the bench.

16                MR. UELAND:  I will, Your Honor.

17                THE COURT:  Anything further on this matter on

18    behalf of the Government?

19                MR. UELAND:  Nothing with respect to detention,

20    but I did want to raise with the Court that the United

21    States filed a motion --

22                THE COURT:  Yes.

23                MR. UELAND:  -- to consider this case complex and

24    continue the dates out.  Ms. Atwal and I had a discussion

25    briefly prior to the detention hearing that those dates

1    might not be sufficient given the nature of the evidence in

2    this case and the volume of it.  I don't know where that

3    order currently is, Your Honor.

4              THE COURT:  Okay.  Let me address that in a moment

5    then, if I can.

6              But first let me ask, Ms. Atwal, do you have

7    anything further on the detention hearing?

8              MS. ATWAL:  Not at this time, Your Honor.

9              THE COURT:  All right.

10             Let me last just say before I get to the issue of

11   the motion that was filed to designate this as a complex

12   case and to extend the various deadlines that are set forth

13   in the arraignment order, that underlying my decision about

14   not to release the defendant to a halfway house is because I

15   am -- it is just too easy for an individual who is

16   incentivized to do so to leave that halfway house, and once

17   they leave, the amount of time that can transpire, whether

18   it is hours or days before law enforcement is able to

19   apprehend that individual, is simply not a risk I am willing

20   to take here.  There is just no guarantees with a halfway

21   house or with GPS monitoring that in fact an individual who

22   wishes to leave the halfway house can't.  And because it is

23   not a secure facility, that drove much of my decision, as

24   well as I looked at the various factors that I must consider

25   under 3142.  So I wanted to make that clear as well.

1          With respect to the pending motion, my intention

2     was based on the representations by the Government in that

3     motion that the defendant didn't object to the designation

4     of this case as a complex case and to extend the deadlines

5     by 90 days.  I had intended to draft an order that granted

6     the motion and I wasn't going to require a hearing.

7          But it sounds like, Mr. Ueland, you are indicating

8     that from your conversations with Ms. Atwal, that the two of

9     you may believe that extending these dates by 90 days is not

10    adequate, and if that is the case, I can hold up acting on

11    this motion and you could resubmit a different motion

12    proposing different dates if you would like to.

13         And maybe both counsel could come to the podium so

14    I can be sure I can get your remarks on the record.

15         Ms. Atwal?

16         MS. ATWAL:  Your Honor, I have discussed this with

17    my client, just so the Court is aware, that I will be asking

18    for additional time to review the discovery, properly

19    prepare any pretrial motions that are necessary.  At this

20    point Mr. Ueland has told me the amount of discovery.  I

21    don't know if I'm going to have everything done and read and

22    understood and have it reviewed with Mr. Senakh,

23    particularly now that he's going to stay in custody.  I have

24    limited hours at the jail that I can be there to review

25    documents with him.  I do think it's going to take a little

1    bit longer.

2          My suggestion is perhaps we do it for 90 days and

3    if I need to come back to the Court, I can resubmit -- or I

4    can submit something to the Court or we can do it right now

5    and do six months.  I don't know what the Court's preference

6    is.

7          THE COURT:  Mr. Ueland?

8          MR. UELAND:  Your Honor, I think given those

9    difficulties and given what I know about the volume and

10   nature of the evidence in this case, I think six months at

11   this stage might be the appropriate time.  It is a large

12   volume of evidence.  It's in excess of 115 gigabytes of

13   data, which is substantial, and it will take Ms. Atwal some

14   time to review it.  There's obviously the translation issue

15   as an additional layer on top of just the volume.

16          So with all that in mind, perhaps six months makes

17   more sense than three.

18          THE COURT:  Okay.  As I think about this, when the

19   motion came in Judge Schiltz asked that I act on this motion

20   and we did discuss with him the proposal of moving

21   everything out 90 days and he was fine with that.  But I

22   haven't, obviously because you all are raising it right now,

23   discussed with him moving it out six months.

24          So here is what I'd like to do.  I'd like you to

25   resubmit the motion then, whether it's a joint motion or a

1    motion by the Government that the defendant joins in,

2    setting forth why you need six months.  Included within that

3    will be the fact that the defendant is detained, which

4    creates additional issues for defense counsel in terms of

5    getting together with his client so that I can then make

6    sure that Judge Schiltz is okay with the six-month extension

7    as well.  I'm assuming he won't have an issue with it, but I

8    think it would be best to make sure that we have a record to

9    support the six months as opposed to three months.

10          So my thinking is I will hold off acting on this

11   motion and ask -- and give you a time, if you could submit

12   it next week, for a motion for six months then, and then we

13   can pursue it after that.

14          MR. UELAND:  We'll confer and submit something,

15   Your Honor.

16          MS. ATWAL:  Thank you, Your Honor.

17          THE COURT:  All right.  Thank you very much.

18          And Ms. Atwal, let me just say there are options

19   for having your client transported to the federal courthouse

20   and to be able to meet with him here that may address some

21   of the issues that you have -- that are presented by having

22   an individual in detention and the need for an interpreter

23   out at Sherburne, so I hope you will pursue that as well.

24          MS. ATWAL:  And, Your Honor, those aren't always

25   ideal.  Sometimes it's been that we've had somebody

1    scheduled and then they don't show up just because

2    transport's busy or there's other people.  It's a great idea

3    and I wish it worked a little bit more smoothly, but to say

4    that that's a remedy, it just -- my experience has been it's

5    just not been very good.  When I tell a client we're going

6    to have a meeting on Thursday and then the marshals are not

7    able to bring that person, it creates much tension.

8            The biggest frustration I'm having right now is

9    that he is in shackles every time I meet him and I'm --

10   literally, I don't know what I'm going to do about this,

11   because I can't imagine going through a case that's this

12   complex with a defendant that's constantly cuffed.  I'm not

13   sure what can be done about that.

14           THE COURT:  All right.  Well, my assumption is

15   you're going to work to address it and if you need the

16   Court's assistance, then I assume you will contact the Court

17   as well.

18           MS. ATWAL:  I will, Your Honor.  Thank you.

19           THE COURT:  All right.  That concludes this

20   proceeding.  Thank you very much, everyone.

21           (Proceedings concluded at 12:56 p.m.)

22                   *      *      *      *

23

24

25

**I  N  D  E  X**

**W I T N E S S:**                                                                **PAGE**

**S/A PAUL COUTURIER**

Direct Examination by Mr. Ueland                      5

Cross-Examination by Ms. Atwal                       22

Redirect Examination by Mr. Ueland                   30

Recross-Examination by Ms. Atwal                     31

\* \* \* \* \*

**E  X  H  I  B  I  T  S**

| NUMBER | FOR ID | IN EVIDENCE |
|---|---|---|
| Government 1 | | 19 |
| Government 2 | | 20 |
| Government 3 | | 21 |
| Defendant 1 | | 35 |

**C E R T I F I C A T E**

I, **TIMOTHY J. WILLETTE**, Official Court Reporter

for the United States District Court, do hereby

certify that the foregoing pages are a true and

accurate transcription of an audio disc of

proceedings taken in the aforementioned matter,

to the best of my skill and ability.

*/s/ Timothy J. Willette*

**TIMOTHY J. WILLETTE, RDR, CRR, CRC**
Official Court Reporter - U.S. District Court
1005 United States Courthouse
300 South Fourth Street
Minneapolis, Minnesota  55415-2247
612.664.5108