UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 15-11 (PJS/SER)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **DEFENDANT'S SENTENCING** |
| | ) | **POSITION** |
| MAXIM SENAKH, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Suitcases were packed.  Snacks were tucked away in a cooler.  A family video recorder and camera were stored away in the trunk, ready to document the Senakh's family vacation.  As Maxim Senakh drove across the border from Russia into Finland on August 8, 2015, he was stopped by the law enforcement.  He looked at his wife and son and knew it would be a long time before he saw them again.  Maxim Senakh knew that sooner or later he would have to answer for profiting from redirecting illegal obtained traffic/visitors to websites such as Adult Friend Finder.

Forty-one year old Russian citizen Maxim Senakh has accepted responsibility for his actions. He has expressed his sincere regret for the wrongs that he has committed, and signed a plea agreement that called for penalties up to five years in prison followed by three years' supervised release. In so doing, Mr. Senakh has agreed to pay for his wrongdoing

with years apart from his wife and young son, as well as his parents and sister, thousands of miles away from their home country.

Mr. Senakh acknowledges that he has caused damage and broken the law by misusing his technical skills, and profoundly regrets the harm he has done to others. He realizes that he has done the most harm to those he loves most, leaving his wife to raise their son without his financial or emotional support and also unable to provide support to the family's aging parents. He does not have any prior criminal history and is unaccustomed to jail life. Since being in custody, he has resolved to improve himself as much as possible.

After being arrested in Finland on August 8, 2015, Mr. Senakh was extradited to the United States on February 4, 2016. He has remained in custody for two years. Despite having difficulty communicating with authorities at the jail and other inmates, Mr. Senakh has managed to follow all the rules and has not had a single violation in two years. Given the amount of time he has served and deportation that will follow, he respectfully requests the Court impose a sentence of no more than three years.

## SENTENCING ANALYSIS

### I. OFFENSE CONDUCT

#### A. MR. SENAKH'S ROLE.

Mr. Senakh admits his participation in directing web traffic originating from Ebury-infected servers in order to collect a commission based upon the purchases made by visitors directed to sites such as Adult Friend Finder ("AFF"). Visitors went to a particular website

such as myphotohome.com and were automatically redirected to websites such as AFF. Once the visitor was redirected to AFF, the visitor had a choice to pay to subscribe to the AFF.   If the visitor subscribed to AFF, Mr. Senakh was paid a percentage of the subscription. Mr. Senakh did not receive any money for directing visitors from advertisements (legitimate or otherwise) *per se*; rather, he was paid a portion of whatever profit the end customer derived from a visitor's purchases on their website.  In total, AFF paid Mr. Senakh $228,018.56.  Mr. Senakh, who had an agreement with a co-conspirators, split the money 50-50.  Money was transferred to the conspirators via the internet. Further, Mr. Senakh has acknowledged that he was aware that there were spam emails that were sent by co-conspirators, and those spam emails redirected traffic. Finally, Mr. Senakh admits to paragraph 2 of the signed Plea Agreement which includes additional details.

**B.    Why did Mr. Senakh become involved in the conspiracy?**

Since 2001, Mr. Senakh has been self-employed. He legitimately was paid by websites for traffic that was legally directed to them. The action was legal.  The legal traffic was bought and sold on various internet forums. It was on a forum that he was introduced to a co-conspirator through a mutual friend.  Beginning sometime in 2008, Mr. Senakh began his illegal actions.  He believed that his illegal actions were acceptable because no one was forced to follow a link, much less spend any money, and he was only paid a fraction of the revenue he generated for websites with which he had an affiliate relationship. Looking back, Mr. Senakh knows he was causing harm, but he admits he

began getting used to the money.  As the illegally obtained traffic increased, he began receiving more money.  His entire motivation for this crime was purely financial. He came to rely upon the additional income the crime generated to pay his household's monthly expenses, pay for travel, and to help support his aging parents as well as his mother-in-law. It is incorrect, though, to characterize Mr. Senakh's conduct as that of an unrepentant, opportunistic hacker with no regard for the trouble he has caused to others. Mr. Senakh has made his living throughout his life by working hard at a series of entrepreneurial ventures, with varied success.  As a child, he took pride in working small jobs to contribute to the household. From his standpoint, this entire episode has been a terrible but isolated lapse of judgment and character that resulted from his greed. The damage that his actions have caused to others and his family has been beyond what words can express.

**C.      This offense conduct will not occur in the future and the public is safe.**

Mr. Senakh admits that he was tempted into illegal activity by the pull of extra income with what he perceived then as doing little harm and posing a low risk of negative consequences. He never contemplated the possibility that he would become part of a scheme with the magnitude and impact of Ebury and the Ebury Botnet. With hindsight, he can now admit that he knew what he was doing violated laws and the trust of those with whom he did business, as well as those people in his life who are nearest and dearest to him.  With the knowledge alone, the public is protected. In other words, because Mr. Senakh understands the wrong he has committed and regrets his legal actions, the public is

protected from future harms.  Further, as the Court is aware, he has no prior criminal history and this offense is his only criminal activity.

The views regarding the best way to achieve the goals of sentencing are evolving, as more is known about the effects of different approaches. In a study published by the Department of Justice, comprehensive research shows that longer sentences not only fail to more effectively deter crime at the individual or general level, they are often counterproductive: "increasing the severity of punishment does little to deter crime . . . [because of] [t]he lack of any 'chastening' effect from prison sentences, [t]hat prisons may exacerbate recidivism, [t]he different impacts of the certainty versus the severity of punishment on deterrence, and [t]hat individuals grow out of criminal activity as they age." *Five Things About Deterrence*, U.S. Dept. Of Justice, Office of Justice Programs, National Institute of Justice, 2 (May 2016) (available at https://ncjrs.gov/pdffiles1/nij/247350.pdf). As one court concluded after an exhaustive discussion of what it called "[a]n avalanche of criminological studies," though it is difficult to pinpoint precisely why, "certainty is so much more effective than severity at deterring criminal behavior." *United States v. Martinez*, 184 F. Supp. 3d 1209, 1235-36 (D.N.M.), aff'd, 660 F. App'x 659 (10th Cir. 2016). The court goes on to say that in its experience, "most federal defendants have no idea how harsh federal sentences are, which would obviously prevent them from acting as an effective deterrent." *Id.* at 1236.

That being said, is Mr. Senakh deterred from future crimes? The answer is yes. Mr. Senakh's greatest regret is that his family is suffering for his wrongdoing, and he is resolute that he will never again risk their wellbeing for short-term financial gain. Mr. Senakh's life has been severely impacted by his time in custody. While he accepts that this is not undeserved in light of his misdeeds, what Mr. Senakh wants most in the world is to return to his family and resume what had once been a promising career as a programmer. He is in a foreign country, in jail, has no visitors other than his attorney, and does not speak English. Until a month ago, there were no other inmates at the Sherburne County Jail that spoke Russian. Last month a Russian-speaking defendant was detained at Sherburne but placed in a different housing unit than Mr. Senakh. Mr. Senakh's time in jail has been much harsher than time served by other inmates. As he has stated to counsel on more than one occasion, the time has been a very difficult punishment and lesson to learn. Mr. Senakh is very remorseful and determined to better himself and stay on the straight and narrow, in no small part due to the hardship that imprisonment has already imposed on himself and his family. No one considering a foray into the world of illegal web traffic would or should envy his current position.

## II.   THE PRE-SENTENCE REPORT

### A.   Mr. Senakh does not object to the guideline calculations as outlined in the PSR to the extent that they comport with the Plea Agreement.

As outlined in the Plea Agreement, the parties agreed that Mr. Senakh's offense level is 23 and he falls within criminal history category I. The determinations contained in the

Pre-Sentence Investigation Report ("PSR") reached the same conclusions. Specifically, the range for any term of imprisonment is 46-57 months in both documents.

   **B.   Mr. Senakh does not object to the fine range within the PSR and requests no fine be imposed.**

   The PSR notes that the fine range for this offense is from $10,000 to $100,000 pursuant to USSG §§5E1.2(c)(3) and 5E1.2(h)(1). (PSR ¶68.)  He does not have the ability to pay a fine.  His assets consist of his $769 inflatable boat and $9 in a bank account.  The only asset that was transferred into his wife's name after his arrest was a vehicle. This was done so his wife can pay for the taxes on the vehicle while Mr. Senakh is in custody. He further owes close to $100,000 for a personal loan. His younger sister has been financially supporting Mr. Senakh while he has been held in custody because he does not have any money to pay for stamps and or phone calls.   His wife has supported herself and their son through property she owns and rents.  Given the expenses the family has and the lack of assets, Mr. Senakh does not have the ability to pay a fine.

   **C.   Mr. Senakh objects to the findings regarding restitution.**

   The government contends that the only monetary loss is to AFF in the amount of $228,018.56.  (PSR ¶19.) As stated in the Addendum of the PSR, Mr. Senakh objects to the restitution amount requested.  The PSR concludes that AFF paid the defendant for a legitimate service that he did not provide, and the fact that AFF may have profited from Mr. Senakh's redirected traffic appears irrelevant.  Further, the PSR finds the restitution is correct because "the government did not object to the restitution amount proposed by the

report." (See PSR Addendum).  As stated earlier in this pleading, AFF paid Mr. Senakh and the co-conspirators for each visitor that subscribed to their website. AFF did not pay for those visitors that simply visited the website. In other words, AFF has not suffered a loss in the amount of $228,018.56. The issue is discussed further below.

### D.     Supervised Release.

Under the guidelines, the supervised release term is one to three years and the statutory term is no more than three years.  (PSR, ¶62, 63.)  Mr. Senakh is respectfully requesting the Court to impose no term of supervision.

Pursuant to 18 U.S.C. §3583, in sentencing the court may include a term of supervised release following a term of imprisonment. 18 U.S.C. §3583(a). The factors to be considered include many of those set forth in 18 U.S.C. §3553(a), but does not direct the court to consider the need for the sentence imposed for the purpose of 3553(a)(2)(A): "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. 3553(a)(2)(A). As the Sentencing Commission has explained, this is in keeping with the legislative purpose of supervised release when it is imposed, "because the primary purpose of supervised release is to facilitate the integration of offenders back into the community rather than to punish them." United States Sentencing Commission, *Federal Offenders Sentenced to Supervised Release,* p. 10 (July 2010) (hereinafter "Supervised Release Report"; *see also Johnson v. United States,* 529 U.S. 694, 709 (2000). The same Sentencing Commission report also indicates that "[c]riminal aliens

subject to deportation are not subject to traditional supervision in the United States," under 18 U.S.C. § 3583(d)(3), except for ordering deportation as a condition of supervised release. Supervised Release Report at 60.

According to Section 5D1.1(c) of the Guidelines, the court "ordinarily should not impose a term of supervised release in a case in which supervised release is not required by statute and the defendant is a deportable alien who likely will be deported after imprisonment." U.S.S.G. §5D1.1(c). The notes elaborate on the reasoning behind this section, stating that such supervision would only be necessary if the defendant were to legally return to the United States; if the defendant were to enter the country illegally that could best be addressed through a separate prosecution. U.S.S.G. §5D1.1(c) cmt. n. 5. The application note only calls for considering the imposition of supervised release when a court determines "it would provide an added measure of deterrence and protection based on the facts and circumstances of a particular case." *Id.*

A 2013 Second Circuit opinion illustrates such an extraordinary case– the court explained that it deemed the defendant likely to "try to turn around and come back into the United States after any term of imprisonment that he serves" but imposed a term of supervised release to send the message that the defendant was not to return. *United States v. Alvarado,* 720 F.3d 153, 158 (2d Cir. 2013).

This is not the situation with Mr. Senakh. He has only entered the United States due to extradition in this matter and has no desire to remain after a term of imprisonment. He

will be returned to Russia. His entire life is based in his home country, and his dearest hope is to reunite with his family there and be closer to his sister who lives in Finland. Mr. Senakh expects to be deported, and in any event, wants to leave the U.S. and return to Russia. He has pled guilty to a Class D felony and as such, the Court is not required to impose supervision. Respectfully, he requests the Court not impose a term of supervision.

## III.   MAXIM SENAKH'S BACKGROUND

Maxim Senakh grew up in Kostomuksha, Republic of Karelia, which borders Finland in Russia's northern Great Lakes region. Karelia's capital, Petrozavodsk, is a sister city of Duluth, Minnesota, and appropriately matched– both cities are set against enormous, frigid lakes with fortunes that rise and fall with the shipping and mining industries. Though his childhood was set in the larger tumult of the fall of the Soviet Union, and both of Mr. Senakh's parents worked, they managed to provide him and his younger sister Nadya a happy upbringing. Mr. Senakh grew up in a close-knit family with parents who balanced their schedules so they could spend time with the children, and he helped his parents by taking care of his little sister, who was six years his junior, in the mornings and after school by braiding his little sister's hair, helping with homework, and fixing meals.

The Senakh family was never rich. Mr. Senakh contributed to the family income from a young age by picking berries to sell, and he has maintained his strong work ethic ever since. He was a bright student who transitioned well from secondary school to college after his graduation at age seventeen. Mr. Senakh obtained a degree in engineering and computer science from the North-West Open Technical University in Saint Petersburg by

correspondence while still working full-time to support himself, rising to the position of lead engineer in his department of the computer company where his mother also worked in the warehouse. Though his mother and father divorced soon after he graduated from high school, Mr. Senakh remained close with both parents.

Mr. Senakh's priority throughout his life has been his family. He met his wife Tatiana while he was in college and they married after his graduation from college. Their son Oleg was born three years later. Around the same time he became a parent, Mr. Senakh began to work as an independent computer programmer, and his wife managed a commercial space for extra income. Mr. Senakh's life back in Russia was in many ways that of a normal, functioning husband and father–he did require medical treatment for severe headaches but it otherwise fairly healthy, has never used drugs, and has at most one drink per week. Like his parents did for him, Mr. Senakh has always made time to spend with his son and the two are very close.

Since Mr. Senakh was taken into custody in August 2015, his wife and now fourteen-year-old son have been living without him in the city of Veliky Novgorod, about 125 miles south of Saint Petersburg. Mr. Senakh is eager to reunite with his family. He has let his family down by committing a crime and as such he is working hard to make positive use of his time in jail. He is reading non-fiction and self-improvement books sent by his younger sister and studying to improve his English. He has promised his family he will leave custody a better person. Mr. Senakh, for his part, has concerns for his family's ability

to continue to get by without his support, and hopes to rejoin his family in Russia. He realizes that his own actions led to his current predicament, and has repeatedly and strongly expressed his great remorse for what he has done.

As he participated in lengthy interrogations with law enforcement officials in Finland.  He made it clear that as he undertook his scheme to create multiple affiliate accounts, he did not set out to harm anyone and considered his conduct to be common and within the bounds of regular business, directing traffic to sites that wanted it and were willing to pay and never venturing into the seedier realms of illegal online activity or physically harming anyone. However, he has come to realize the full impact of his actions and the damage it caused to others. As Mr. Senakh states in his acceptance statement, "I take full responsibility." He feels that his actions do not reflect his true character, and regrets that he has lost the trust of those dearest to him. Mr. Senakh went on to say in his statement, "I hurt my family the most. My son and wife have suffered because of the illegal decisions I made…it is my actions that have placed me here. I know I never ever want to be in prison or jail ever again. I'm sorry for all of this."

## IV.    OTHER DEFENDANTS' SENTENCING IN SIMILAR CASES.

Counsel is unaware of co-conspirators arrested in this case. Defendant Donald Austin appears in the discovery. He has been charged in the Northern District of California under 16-00269 and a guilty plea was entered earlier this year.  An ECF query shows much of the case has been sealed.

While Mr. Senakh's case is not identical to those of other recently sentenced defendants' in its underlying conduct or circumstances, several recent sentences in comparable cases offer examples of what would be reasonable in consideration of "the need to avoid unwarranted sentence disparities." 18 U.S.C. § 3553(a)(6).

Late last year, two defendants who admitted to selling software that allowed buyers to illegally access the private, password-protected photos of customers of an online photo storage service were sentenced to 29 months in prison and 3 years of probation, respectively. *United States v. Bourret et al,* Docket No. 1:15-cr-00203, entries 129 and 131 (D. Colo. May 6, 2015). These two men exploited vulnerabilities in the target website's security in a way that not only allowed unauthorized access to individual customers' photos, it specifically sought and found revealing or explicit personal pictures. *Id.* Both men pled guilty to single counts of conspiracy to commit computer fraud and abuse in violation of 18 U.S.C. §§ 371, 1028, 1029, 1030, and 1343 and were ordered to pay monetary and in-kind restitution for damages caused. *Id.*

Earlier this year, another defendant who pled guilty to three counts of conspiracy to commit wire fraud, conspiracy to commit wire fraud and related activity in connection with computers, and aggravated identity theft in violation of 18 U.S.C. §§ 1349, 371, and 1028A(a)(1) was sentenced to 30 months in prison and ordered to pay approximately $3,000,000 in restitution. *United States v. Iermolovych,* Docket No. 2:16-cr-00235, entry 30 (D.N.J. May 16, 2016). That defendant had hacked into the systems of news

organizations in order to steal confidential, unpublished press releases from companies to enable stock trades based on the information before it was publicly known and stole individuals' credit card information as well, yielding ill-gotten gains of over $30 million. *Id.*

Most recently, a man convicted of one count of wire fraud under 18 U.S.C. §§ 1343 and 1349 was sentenced to 58 months in prison. *United States v. Simeu,* Docket No. 17-12505, entry 53 (11th Cir. Jun. 2, 2017). He took part in a phishing scheme that involved issuing and selling fraudulent airline tickets valued at more than $2,000,000. *Id.*

**V.**      **A DOWNWARD VARIANCE IS REQUESTED**

   **A.      Time Served outside the United States.**

The Bureau of Prisons is directed to calculate custody credit for prisoners who are transferred from foreign custody to a United States prison to serve the remainder of a sentence imposed by a foreign court under 18 U.S.C. §4105, and specifically instructs that "[t]he transferred offender shall be given credit toward service of the sentence for any days, prior to the date of commencement of the sentence, spent in custody in connection with the offense or acts for which the sentence was imposed."18 U.S.C. § 4105(b). With respect to time spent overseas awaiting trial, however, the Bureau of Prisons is *not* given any guidance under the relevant chapter of the United States Code. 18 U.S.C. § 4100-15. As such, Mr. Senakh may not receive credit for the seven months he was held in a Finnish jail in the instant case.

Courts have held that time served outside of the United States while awaiting extradition can be credited toward the sentence at the time of imposition.   Typically, if a person is transferred from a foreign country to the United States to serve the remainder of a previously imposed sentence for the same underlying conduct, it is left to the Bureau of Prisons to translate their time in custody into terms and conditions under the American system, including any "good time credits." *See, e.g.*, *Asare v. United States Parole Comm'n*, 2 F.3d 540, 542 (4th Cir. 1993) (outlining the implementation of sentences for transferred federal inmates).

However, in a case where the defendant was detained in France prior to his transfer and trial in the United States for conspiracy to commit wire fraud, an Eleventh Circuit court found that the custodial sentence began with the defendant's detention on the criminal complaint. *United States v. Simeu*, No. 1:14-CR-00357-WSD, 2017 WL 2664722, at *1 (N.D. Ga. June 21, 2017). The court relied upon U.S.S.G. §§ 5G1.3(b) and 5K2.23. *Id.* at *2. In particular, § 5G1.3(b)(1) reads that "the court shall adjust the sentence for any period of imprisonment already served on the undischarged term of imprisonment if the court determines that such period of imprisonment will not be credited to the federal sentence by the Bureau of Prisons," and the guidance provided in the application note for § 5G1.3 which reads that ("[A] downward departure is not prohibited if the defendant (A) had completed serving a term of imprisonment; and (B) subsection (b) would have provided an adjustment had that completed term of imprisonment been undischarged at the time of sentence for the

instant offense." *Id.*, quoting U.S.S.G. §§ 5G1.3 app. n. 4, 5K2.23. The *Simeu* court also drew from another Eleventh Circuit decision which held that a downward departure for time served abroad "'may be appropriate' if a defendant has completed serving a term of imprisonment and would be eligible for a sentence adjustment under U.S.S.G. § 5G1.3 had his sentence been undischarged at the time of federal sentencing." *Id.,* quoting *United States v. Channelle*, 392 Fed.Appx. 729, 733 (11th Cir. 2010).

Furthermore, the language of § 5G1.3 demonstrates that the guidelines are intended to credit a sentenced person with the full amount of time spent in incarceration for the same conduct, and include a catch-all policy statement that follows the more narrowly-written situations in (a)-(c):

> In any other case involving an undischarged term of imprisonment, the sentence for the instant offense may be imposed to run concurrently, partially concurrently, or consecutively to the prior undischarged term of imprisonment to achieve a reasonable punishment for the instant offense.

U.S.S.G. § 5G1.3(d).  The Application Notes for § 5G elaborate on the drafters' intent to factor time served into sentencing, offering instructions on the way to write the calculations into a Judgment in a Criminal Case Order. U.S.S.G. § 5G1.3 app. n. 2(C), (D).

According to 18 U.S.C. § 3553(a), sentencing courts "shall impose a sentence sufficient, but not greater than necessary" to further the goals of just punishment, adequate deterrence, protection of the public, and needed educational or vocational training, medical care, or other correctional treatment for the defendant.18 U.S.C.A. § 3553 (West). As

articulated in *Gall v. United States* in an opinion that built upon the *Booker* and *Rita* decisions, the Guidelines are advisory and in setting a "reasonable" sentence, a court "may not presume that the Guidelines range is reasonable" and "must make an individualized assessment based on the facts presented." *Gall v. United States*, 552 U.S. 38, 46, 50 (2007), (citing *United States v. Booker*, 543 U.S. 220 (2005); *Rita v. United States*, 551 U.S. 338 (2007)).

Mr. Senakh spent approximately seven months in custody in Finland on the arrest warrant in the instant case. (PSR ¶15.)  Mr. Senakh was not convicted for the conduct related to the current offenses in any other court, and has been held pending the outcome of this case. It is appropriate and just under the Guidelines and the broadly stated goals under 18 U.S.C. § 3553 that Mr. Senakh's time in custody be taken into account as he is sentenced.

### B.      Time Served at the Sherburne County Jail.

Again, Mr. Senakh has served a year and half in a jail where he has difficulty communicating with staff and fellow inmates. A majority of his interaction with others is done by "acting" out words.  His refuge is when counsel visits with an interpreter who speaks the same language.  During his time at Sherburne, he has committed no violations. He spends a majority of his time reading self-help books that his sister sends. He further carries a Russian-English dictionary to teach himself English.

## VI.   RESTITUTION

As stated earlier in the pleading, Mr. Senakh objects to restitution amount requested

by AFF.  Mr. Senakh agrees that Mandatory Victims Restitution Act ("MVRA") applies in

this case. (Plea Agreement ¶9 and PSR ¶70.) In part, the MVRA reads:

> For the purposes of this section, the term "victim" means a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.

18 U.S.C. § 3663A(a)(2). The Eighth Circuit recently reiterated holdings of its sister

courts and the Supreme Court regarding the purpose of the MVRA, which is to "assure that

victims of crime receive full restitution." *United States v. Adetiloye,* 716 F.3d 1030, 1040

(8th Cir. 2013); (citing *Dolan v. United States.* 560 U.S. 605 (2010); *United States v.*

*Statman,* 604 F.3d 529, 538 (8th Cir. 2010) with quotation and citation omitted).

There is wide agreement that restitution exceeding the amount of the victim's actual

loss would be punitive and therefore fall outside the purpose authorized by the MVRA, and

further, that "the defendant's gain is not an appropriate measure of the victim's actual loss

in MVRA calculations." *United States v. Fair,* 699 F.3d 508, 512-13, (D.C. Cir. 2012),

(citing *United States v. Chalupnik,* 514 F.3d 748, 754-55 (8th Cir. 2008) (internal citations

omitted); *United States v. Hudson,* 483 F.3d 707, 710 (10th Cir. 2007); *United States v.*

*Zangari,* 677 F.3d 86, 92–93 (2d Cir. 2012); *United States v. Arledge,* 553 F.3d 881, 899

(5th Cir. 2008); *United States v. Gallant,* 537 F.3d 1202, 1247 (10th Cir.2008); *United*

*States v. Galloway,* 509 F.3d 1246, 1253 (10th Cir.2007); *cf. United States v. Kuo,* 620

F.3d 1158, 1164–65 (9th Cir.2010); *United States v. Harvey,* 532 F.3d 326, 341 (4th Cir.2008); *United States v. Badaracco,* 954 F.2d 928, 942–43 (3d Cir.1992)); *see also United States v. Anderson,* 741 f.3d 938, 951 (9th Cir. 2013). The *Fair* court went on to "join the circuit courts of appeals" and held that the judgment must be based on the actual, provable loss, while "disgorgement of profits and ill-gotten gains" could be achieved through civil mechanisms. *Id.* at 514.

The burden to prove the amount of damages falls upon the government, and must be shown by a preponderance of the evidence. *Id.* at 516; *Chalupnik* at 754; *United States v. Waknine,* 543 F.3d 546, 558 (9th Cir. 2008): "It is unreasonable to expect a defendant to be able to counter evidence provided by the victim concerning attorneys' fees. Rather, it is the responsibility of the government, aided by the victim, to provide adequate reliable evidence. *See* 18 U.S.C. § 3664(d)(6).") What is more, the award must be limited to compensation for loss caused by the offense of conviction and not by unrelated conduct, "even if that unrelated conduct was the subject of criminal charges dropped by the government in exchange for the defendant's guilty plea." *Chalupnik* at 753; (citing *Hughey v. United States,* 495 U.S. 411, 420-21 (1979).)

The restitution is not meant to be a windfall for the victim, and any gains received by the victim because of the defendant's actions must be subtracted from the award. *Id.* at 755; *United States v. Adejumo,* 848 F.3d 868, 870 (8th Cir. 2017); *United States v.*

*Swanson,* 394 F.3d 520, 527-28 (7th Cir. 2005); *United States v. Matsumaru,* 244 F.3d 1092, 1109 (9th Cir. 2001).

Restitution should be limited to proven, actual losses minus any benefit gained through the underlying conduct. The PSR wrongly calls for restitution in the amount of $228,018.56. (PSR ¶70.) With respect to AFF, their business relationship resulted in a profit, and the revenue generated from Mr. Senakh's traffic was such that at the time of his arrest, the accounts under his control still showed a remaining commission due to be paid. Mr. Senakh's affiliate arrangement with buyers of his traffic such as AFF was structured so that he was only paid a percentage of the purchases voluntarily made by a visitor who navigated to the end website, no matter how they had arrived at that end.  Because AFF never suffered a loss, they are not owed restitution in the amount of $228,018.56.

## VII.   FUTURE

Mr. Senakh is intelligent and hardworking. He is fortunate to have a loving and supportive family who are eager for his return. His employment prospects back home are good and he is resolved to make an honest living so he can provide for his family and pay his sister back for her financial support over the last two years. Mr. Senakh has the capacity and the will to make great contributions to the fields in which he works and to his family. He has spent his time in custody reflecting on his mistakes, working to improve himself, and planning new projects and creations that he hopes will improve the lives of others by developing new ways to analyze the quality of indoor environments through technology.

## CONCLUSION

Mr. Senakh committed a crime. He has admitted to his wrong doings. He has admitted that he financially benefited from his illegal actions.  He has been cooperative and remains remorseful and determined to restore his standing as a gifted programmer, son, brother, husband, and father with enormous contributions to make both to his family and to society at large. Based on this pleading and letters that will be sent to Court once the translations have been corrected, Mr. Senakh respectfully requests a sentence of 36-months with no supervision to follow. A sentence of such is justified and reasonable based on the facts and circumstances of this case.

Dated:	July 13, 2017

Respectfully submitted,

*s/Manny K. Atwal*

_____
MANNY K. ATWAL
Attorney No. 282029
Attorney for Defendant
Office of the Federal Defender
107 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415